**FILED**
**Oct 15, 2025**
**01:22 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT COOKEVILLE

| | | |
|---|---|---|
| JEFFREY MOLANDS, Administrator, THE ESTATE OF MARSHA MOLANDS,<br>        Employee, | ) ) ) ) | Docket No. 2017-04-0093 |
| v. | ) | State File No. 13763-2017 |
| ACCESS PROGRAM,<br>        Employer, | ) ) | |
| And | ) | |
| BRIDGEFIELD CAS. INS. CO.,<br>        Insurer. | ) ) | Judge Robert Durham |

---

### COMPENSATION ORDER GRANTING BENEFITS

---

The Court held a Compensation Hearing on September 21, 2025, to determine a threshold issue: whether Ms. Molands's death arose primarily out of her 2017 work injury. If so, the remaining issues are the amount Mr. Molands may be entitled as Ms. Molands's sole dependent; whether the benefits should be paid in a lump sum; and whether Access must pay additional temporary total disability and medical expenses related to her post-surgical infections.[1]

The Court holds that Mr. Molands is entitled to death benefits, to be paid in installments, and reimbursement for medical and funeral expenses. However, Mr. Molands did not prove entitlement to additional temporary disability benefits.

---

[1] Although the Petition for Benefit Determination was not amended to include Jeffrey Molands as Ms. Molands's dependent after Mr. Molands filed a suggestion of death, the issue was fully litigated through the presentation of evidence, the parties' stipulations, the parties' pre-trial briefs, and argument. Given these circumstances, and that no one objected, the Court holds that the issue was "tried by express or implied consent of the parties" and thus, the issue "shall be treated in all respects as if [it] had been raised in the pleadings." Tenn. R. Civ. P. 15.02 (2024).

1

## History of Claim

Ms. Molands worked as a home health nurse for Access. On February 24, 2017, she suffered low-back and left-shoulder injuries while attempting to remove a patient from a lift. Access accepted Ms. Molands's claim and authorized Dr. Edward Mackey to treat her back. The parties agreed that Dr. Mackey's treatment over the next several years was reasonable and necessary.

Except for a few weeks of light duty with Access, Ms. Molands never worked again.[2] Instead, she received social security disability benefits from October 31, 2017, when Access terminated her employment, until her death in 2024.

In early 2018, Dr. Mackey recommended a L4-5 laminectomy, but utilization review repeatedly denied it. Dr. Mackey did not perform surgery until July 2019, at which time Access reinstated temporary total disability benefits. Despite the surgery, Ms. Molands continued to experience symptoms, including a worsening right-foot drop.

Dr. Mackey continued to treat Ms. Molands and placed her at maximum medical improvement on August 6, 2020. He assigned a 14% impairment and permanent restrictions. Access discontinued temporary total disability benefits at that time.

Throughout 2021 and 2022, Ms. Molands complained of worsening back pain and a recurrence of right-leg pain and weakness. Dr. Mackey recommended an L4-5 fusion, but it was not performed until July 19, 2023. At that time, Access reinstated temporary total disability benefits.

Ms. Molands developed a wound infection after surgery. Treatment for complications from persistent sepsis led to multiple hospitalizations and long-term care in skilled nursing facilities. Ms. Molands passed away in a nursing home on April 8, 2024. Access paid temporary total disability benefits until her death.

The parties deposed Dr. Mackey and questioned Ms. Molands's date of maximum medical improvement and her ability to work. He testified that when he saw her on May 7, 2020, he did not believe she could return to work and neither did she. He also thought it "reasonable to give her additional temporary total disability benefits" due to her inability to work between the date he placed her at maximum medical improvement on August 6, 2020, and her July 2023 surgery.

However, when asked if he "prematurely" placed Ms. Molands at maximum medical improvement in 2020, he responded:

---

[2] The parties provided evidence about Access's termination of Ms. Molands's employment. Given that Mr. Molands only sought temporary total disability benefits, the Court will not summarize it.

A: I don't know. Prematurely? It was, you know, a shared decision between her and myself. Obviously, in hindsight, we would have, given her worsening symptoms, go back and revisit that. And I don't know how that works in terms of work comp law.

Q: Is it your opinion that she would be doing [sic] additional temporary total disability benefits August 11, 2020 through July 18, 2023?

. . .

A: Again, I would – I would defer to the work comp law on that. But yes, once I've decided she need [sic] another surgery, if it's appropriate, then she would need TTD benefits.

Dr. Mackey completed a physician certification form in April 2024 and again listed Ms. Molands's maximum medical improvement date as August 6, 2020.

The parties also asked Dr. Mackey about the cause of Ms. Molands's death at the deposition. He deferred on the cause but said that the MRSA infection had "resolved" when she left the hospital just before her death.

On causation, Mr. Molands introduced the deposition of James Wojcik, M.D., medical examiner, who prepared Ms. Molands's death certificate. Dr. Wojcik attributed her death to the circumstances that led to her first back surgery, and he listed that on the death certificate as an "accident at work" in February 2017.

He further explained that he wrote on the death certificate that Ms. Molands died of cardiorespiratory arrest because "everybody that eventually dies, eventually dies of cardiorespiratory arrest." But he then also listed other causes, such as a laminectomy and fusion, that caused her to suffer infections that "actually led to her cardiorespiratory arrest."

Dr. Wojcik noted that when the hospital discharged Ms. Molands in March 2024, she still had a spinal abscess and sacral osteomyelitis. He said an abscess must be drained before antibiotics can cure the infection because the antibiotics cannot penetrate the abscess cavity. In addition, osteomyelitis, or bone infection, must be cut out of the bone— antibiotics can "almost never" cure it. Thus, he concluded that "it's probably 90% or greater probability that this infection that she had – and she had multiple sources – eventually, she succumbed to that. She just got to the point that the infection overwhelmed her body."

On cross-examination, Dr. Wojcik admitted he is not an infectious disease specialist. He said his staff completed much of the death certificate from information

3

gathered from Mr. Molands. He did not talk with anyone before completing the certificate, and he based his opinion as to the cause of death from the hospital's March discharge summary. He also did not do an autopsy or order toxicology tests because he felt they were unnecessary.

Further, Dr. Wojcik said it was always possible that Ms. Molands died from another cause, but "probably not," and it was "less likely" than that she succumbed to her infection. Dr. Wojcik described this process as a "death spiral," where the body eventually becomes overwhelmed by infection and the heart stops. He concluded that even if something other than heart failure caused Ms. Molands's death, it originated with complications from her post-surgical infection, which was "greater than 50% for sure" the cause of her death.

In addition to medical proof, Mr. Molands testified about his wife's limitations before she passed away. He said that after losing her job, Ms. Molands never recovered the capacity to work, even before her second surgery. Her physical activities were limited to rising from bed, sitting a while, and then returning to bed.

When the infection first developed, Ms. Molands was in a coma for several weeks. After waking, she was transferred to a skilled-care nursing unit, where she developed an abscess at the surgical site. Mr. Molands said it looked as though some animal had taken a huge bite from her back. She was always in severe pain and never off intravenous antibiotics. Shortly before her death, she was on dialysis and required a colostomy bag. He planned to take her from the nursing home because she said she did not want to die there, but she passed away before he could.

As to his ability to manage his finances, Mr. Molands testified that he owned and operated his own business for most of his adult life. He filed bankruptcy once in his early twenties, but that was decades ago. Upon receiving benefits, he planned to pay Ms. Molands's funeral expenses and a loan he took out to renovate their home for Ms. Molands's return.

The parties also submitted the following stipulations:

(1) Ms. Molands's injury date was February 24, 2017.
(2) Ms. Molands's average weekly wage was $728.
(3) Ms. Molands died on April 8, 2024, at the age of 60.
(4) Ms. Molands reached maximum medical improvement on August 6, 2020.
(5) Access paid $89,231.38 in temporary total disability benefits.
(6) The funeral expenses totaled over $10,000.
(7) Jeffrey Molands was Ms. Molands's husband and sole dependent at her death.
(8) Ms. Molands's 2017 work injury caused her post-surgical infection and resulting

complications and need for treatment.[3]


## Findings of Fact and Conclusions of Law

Mr. Molands has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). The Court must decide whether Ms. Moland's death arose primarily out of her employment, and if so, whether Mr. Molands is entitled to payment in a lump sum in addition to the payment of additional temporary disability and medical benefits incurred before her death.

### *Compensability*

The only causation issue is whether Ms. Molands's infection was the primary cause of her death.

Dr. Mackey deferred any opinion on causation to others. But he said that when Ms. Molands was discharged from the hospital in March 2024, test results were negative for infection. However, Dr. Wojcik did not agree that Ms. Molands's infection had healed upon her discharge. He pointed to the abscess and the bone infection and said that antibiotics alone would not clear the infection. He was "80 to 90%" certain that the infection led to a "death spiral" that overwhelmed her body and directly led to her death. Mr. Molands's testimony corroborated the severity of her condition and the damage done by the infection.

Access did not submit any contrary proof as to causation. Thus, the Court holds that Mr. Molands met his burden of proving causation and he is entitled to death benefits under the law.

### *Death Benefits*

When Ms. Molands was injured in 2017, Tennessee Code Annotated section 50-6-210(e)(1) provided that the spouse of an employee who died from a compensable injury and has no dependent children was entitled to weekly benefits equal to one-half the deceased employee's average weekly wage. In 2023, before Ms. Molands's death, this statute was amended to state that the weekly benefits should equal two-thirds of the average weekly wage. The Court must determine which rate applies.

---

[3] Access also offered the testimony by telephone of Joseph Meilich, adjuster for Access's carrier. During cross-examination, Mr. Meilich became belligerent and argumentative. Despite the Court's admonishments, Mr. Meilich's continued this behavior during his testimony, and the Court ended the call and struck all evidence given by Mr. Meilich from the record.

Since the 2023 amendment applies to all injuries occurring after July 1, 2023, the question is whether Ms. Molands's death constituted a new "injury" as defined by the workers' compensation law. Although the Court found no case on point, *Lively ex rel. Lively v. Union Carbide Corp.*, No. E2012-02136-WC-R3-WC, 2013 Tenn. LEXIS 642 (Tenn. Workers' Comp. Panel Aug. 13, 2013), is instructive. The opinion discusses benefits owed from an employee's death due to an occupational disease.

Specifically, in *Lively*, the employee settled a workers' compensation claim for asbestosis. He died several years later, and his dependents sued for death benefits. The parties disputed whether the maximum total benefit should be calculated at the rate applicable to the injury date listed in the settlement or the rate at his death. The Supreme Court Panel held that when an occupational disease causes disablement, the date of disablement becomes the date of injury, not the employee's death. "If an employee becomes partially or totally unable to work as a result of an occupational disease that later results in his or her death, then the employee's death cannot provide a new and separate date of injury." *Id*. at *19.

The same principle applies here. For calculating death benefits, the date of injury is February 24, 2017. Access shall pay Mr. Molands's death benefits at the rate of 50% of Ms. Molands's average weekly wage of $727.99 or $364.00. These benefits end when Mr. Molands's dependency ends through death or remarriage. Tenn. Code Ann. § 50-6-210(e)(8) (2017). In the alternative, the benefits continue until they total, along with any paid temporary disability benefits, the "maximum total benefit" in February 2017, which is 450 weeks times $888.00 or $399,600. *Id.* § 50-6-210(e)(10); *Id.* § 50-6-102(15)(D). The maximum total benefit not only includes death benefits, but also all temporary total disability benefits Ms. Molands received, which total $89,231.38. § 50-6-207(5).

*Lump Sum Payment of Benefits*

Mr. Molands requested that death benefits be paid in a lump sum. Section 50-6-229(a) gives the Court the discretion to order lump-sum awards, including awards for death benefits. *Jones v. Gen'l Accident Ins. Co.*, 856 S.W.2d 136 (Tenn. 1993).

The Workers' Compensation Special Appeals Panel addressed whether commutation is appropriate when a spouse is the sole dependent in *Educators Credit Union v. Gentry*, No. M2003-02865-WC-R3-CV, 2005 Tenn. LEXIS 216, at *8-9 (Tenn. Workers' Comp. Panel Mar. 9, 2005). It held that the contingencies created by sections 50-6-210(E)(4) and (8), which provide that benefits for the sole dependent spouse terminate upon death or remarriage, serve as limits to commutation, since the ultimate sum of future benefits payable cannot be ascertained, given that dependency could end at any time. Thus, it denied commutation. The Panel later applied this same rationale in *Reynolds v. Free Service Tire Co.*, No. E2014-02233-SC-R3-WC, 2015 Tenn. LEXIS 734, at *11-12 (Tenn.

Workers' Comp. Panel Sept. 16, 2015).

However, even if these cases were not controlling, the Court would not commute Mr. Molands's award. Lump-sum awards should "occur only in exceptional circumstances and not as a matter of course." *Clayton v. Cookeville Energy, Inc.*, 824 S.W.2d 167, 169 (Tenn. 1992). Under section 50-6-229(a), Mr. Molands must show that commutation would be in his best interests and that he is able to wisely manage and control the commuted award. The Court finds he did not..

Mr. Molands has operated his own business for much of his adult life, testified without dispute that he can manage his own finances, and he only filed bankruptcy once in his early twenties. However, the mere fact that Mr. Molands can manage his own income is an insufficient reason to award benefits in a lump sum. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992).

Mr. Molands also testified that he planned to use the disability award to pay his wife's funeral expenses and debt he incurred when renovating his home to accommodate his wife's return. These are laudable goals. But given the high standard for commutation, the Court finds this is an inadequate reason to commute the award to a lump sum, particularly since he did not testify as to the estimated expense of the home renovations. *See Summers v. RTR Trans. Servs.,* No. M2022-00084-SC-R3-WC, 2022 Tenn. LEXIS 409, at *10 (Tenn. Workers' Comp. Panel Oct. 28, 2022). Thus, except for accrued benefits, the Court denies his request for commutation.

*Temporary Total Disability Benefits*

Mr. Molands requested temporary total disability benefits from August 10, 2020, through July 18, 2023. To receive these benefits, Mr. Molands must prove: (1) Ms. Molands had a disability from working as the result of a compensable injury; (2) a causal connection between Ms. Molands's injury and the inability to work; and (3) the duration of Ms. Molands's disability. *Simpson v. Satterfield*, 564 S.W.2d 955 (Tenn. 1978). The period of temporary total disability ends when the employee reaches maximum medical improvement or returns to work. *Id.*

The question of when Ms. Molands's temporary total disability ended does not turn on whether she could have returned to work after August 10, 2020—the undisputed evidence established she could not. However, Ms. Molands's inability to work will not entitle her to temporary disability benefits unless she did not reach maximum medical improvement on August 6, 2020. On this issue, the evidence is considerably clouded.

On the one hand, after Dr. Mackey had already placed her at maximum medical improvement on August 6, Ms. Molands had a second surgery that Dr. Mackey attributed to her 2017 injury. Access agreed to reinstate temporary total disability benefits after the

2023 surgery and paid those benefits until her death in 2024. Dr. Mackey also testified that he believed it was "reasonable" to give Ms. Molands temporary disability benefits while waiting for approval for the second surgery. Also, once he decided additional surgery was necessary, Ms. Molands would have "needed" temporary benefits.

On the other hand, when specifically asked whether his opinion that Ms. Molands reached maximum medical improvement in 2020 was "premature," Dr. Mackey said that he did not know, but that given her worsening symptoms, he could have "revisited" it. When asked if she should be entitled to additional temporary benefits, he said he would "defer to workers' comp." He also said in his deposition that Ms. Molands's maximum medical improvement date was August 6, 2020, and then said it again in a C-32 medical report filed in 2025. Dr. Mackey never revised Ms. Molands's maximum medical improvement date or permanent restrictions.

The lay testimony in this case also established that Ms. Molands's condition did not improve after Dr. Mackey placed her at maximum medical improvement. Mr. Molands said that his wife's symptoms never improved after her first surgery in 2020 and she could not work. All she could do was rise from her bed, sit for a bit, and then go back to bed. Finally, and perhaps most significantly, the parties agreed before the hearing that Ms. Molands's maximum medical improvement date was August 6, 2020.

The Court finds that Mr. Molands did not meet his burden of proving that Ms. Molands's estate was entitled to additional temporary total disability benefits.[4]

*Unpaid Medical Expenses, Funeral Expenses, and Attorney's Fees*

The parties agreed to the reasonable necessity of Ms. Molands's medical expenses. So the Court holds that Access shall pay all medical expenses causally related to Ms. Molands's 2017 work injury, including but not limited to her second surgery and all expenses related to her later infection. Specifically, the Court orders Access to pay all medical expenses related to the liens filed by providers against Ms. Molands's estate.

Since the Court determined that Ms. Molands's death arose primarily out of her employment and her funeral expenses exceeded $10,000, Access shall pay the estate $10,000 as reimbursement for those expenses. §50-6-204(c). Mr. Molands's counsel is awarded 20% attorney's fees from this amount. *Summers,* 2022 Tenn. LEXIS 409 at *15. Mr. Molands's attorney's fees shall be paid in a lump sum. *Id.* at *14.

---

[4] The estate did not seek accrued permanent partial disability benefits, and it was not an issue listed on the Dispute Certification Notice.

IT IS, THEREFORE, ORDERED:

1. Mr. Molands is awarded death benefits in the weekly amount of $364.00 from April 9, 2024, until his dependency ends through remarriage or death, or the total temporary and death benefits paid equal the maximum total benefit of $399,600, minus attorney's fees.

2. Mr. Molands's request that his entire death benefits be paid in a lump sum is denied. Access shall pay a lump-sum award of $28,184 in accrued benefits as well as $10,000 in funeral expenses.

3. For the remaining award, Mr. Molands shall receive biweekly payments in the amount of $728.00 for as long as benefits are owed.

4. Mr. Molands's request for additional temporary total disability benefits is denied.

5. Attorney Mark Walker shall be paid attorney's fees in a lump sum of $64,073.72, which equals 20% of the total disability award, less the amount already paid in temporary disability benefits, as well as 20% of the award for funeral expenses.

6. Access shall pay all reasonable and necessary medical expenses that arose primarily from Ms. Molands's 2017 work injury, including all expenses related to her second surgery and later treatment for infection. Specifically, Access shall satisfy and ensure the release of any liens placed on Ms. Molands's estate for these expenses.

7. Access shall pay Mr. Molands's discretionary costs including court reporter fees, the deposition fees of Drs. Mackey and Wojcik, and the cost of Dr. Mackey's C-32. Access shall also pay costs of $150.00 to the Court Clerk within five business days of this order becoming final.

8. Access shall file with the Court Clerk a Statistical Data Form within ten business days of this order becoming final.

9. This Compensation Order is a final adjudication on the merits of Mr. Molands's claim. Unless appealed, it shall become final in 30 days.

**ENTERED October 15, 2025.**

_____
**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

9

**APPENDIX**

Exhibits:
1. Joint Pre-Hearing Statement
2. Stipulations
3. Medical Liens
4. Dr. Mackey's C-32 report
5. Death Certificate
6. Dr. Mackey's deposition with attachments
7. Dr. Wojcik's deposition with attachments
8. Access's Submission of Medical Records
9. Marriage Certificate
10. Funeral Expense Lien
11. Dr. Mackey's affidavit
12. Utilization Review Doctor's Report
13. Dr. Mackey's March 19, 2020 office note
14. Treatment documents

## CERTIFICATE OF SERVICE

I certify that a copy of the order was sent as indicated on October 15, 2025.

| Name | Certified Mail | Email | Service sent to: |
|---|---|---|---|
| Mark Walker | | X | Markwalkerlaw3@gmail.com |
| Allen Grant David Ward | | X | agrant@eraclides.com dward@eraclides.com |

_____
**PENNY SHRUM, Court Clerk**
`WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**


### CERTIFICATE OF SERVICE


I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.


_____

*[Signature of appellant or attorney for appellant]*